PEOPLE *v.* CARDELLA.

1. ARREST—CRIMINAL LAW.

Where police officers, in patrolling a city street, discovered an unlighted automobile standing in an alley close under the shadow of a garage building and filling station, which was not lighted or in use, at 2 o'clock in the morning, in a neighborhood where burglaries had previously been committed, they were justified in suspecting, and had good reason to believe, that any persons in the car at that time were not there for any lawful purpose, and it was their duty to investigate.[1]

2. SAME—SEARCHES AND SEIZURES—VALIDITY—SEARCH WARRANT—BURGLAR TOOLS.

Where police officers, at 2 o'clock in the morning, saw an unlighted automobile standing in a public alley, and, on approaching to investigate, saw burglar tools lying on the floor of the car, they were justified in arresting the persons found sitting in the car, and in searching the car for further evidence of the commission of an offense, although they had no search warrant therefor.[2]

3. CRIMINAL LAW—TRIAL—INSTRUCTIONS—APPEAL AND ERROR.

Although the introductory statement of the judge's charge to the jury on the question of the validity of the search and seizure may have been open to the objection that it left to the jury said question when it should have been disposed of by the court as a question of law, where it was followed by instructions correctly giving the applicable rule of law, with further instructions to follow the law as given, there was no reversible error.[3]

4. SAME—ADMISSIONS—EVIDENCE.

Where defendants, jointly informed against and tried together, had made statements following their arrest after being fully warned and advised of their rights in that respect, there was no error in the admission of said statements, although not made in the presence of each other,

[1]Arrest, 5 C. J. § 46; [2]Id., 5 C. J. § 46; [3]Criminal Law, 16 C. J. § 2493.

Admissibility in evidence against defendant of documents or articles taken from him, see notes in 59 L. R. A. 466; 8 L. R. A. (N. S.) 762; 34 L. R. A. (N. S.) 58; L. R. A. 1915B, 834; L. R. A. 1916E, 715.

where the trial court instructed the jury that they must apply the statement made by each one to the one who made it, and not extend it to the other.[4]

Error to St. Clair; Law (Eugene F.), J.    Submitted January 14, 1926.    (Docket No. 134.)    Decided January 28, 1926.

Joe Cardella and Tom Medo were convicted of having in their possession with criminal intent certain burglar tools, and sentenced to imprisonment in the State prison at Marquette.    Affirmed.

*Herman H. Greenberg,* for appellants.

STEERE, J.    Defendants were tried by jury, convicted and sentenced in the circuit court of St. Clair county for having in their possession with criminal intent certain described burglar tools in violation of the statute in such case made and provided.    When arraigned they declined to plead, and a plea of not guilty was entered in their behalf by the court.    Their counsel then interposed a motion to quash the information and discharge defendants on the ground that the evidence against them had been obtained by an unlawful search and seizure.    This motion was denied and the case brought on for trial.    Defendants did not take the stand and no testimony was introduced in their behalf.    Testimony introduced by the prosecution showed that defendants were arrested about 2 o'clock in the morning of May 9, 1924, in the city of Port Huron, by Lieutenant John Mills and Patrolman Thomas Davidson of the police department of that city while the latter were patrolling in a Ford car a thoroughfare called Military street or road, which extended through and beyond Port Huron, directly connecting it with Detroit.    It was a dark and rainy

---

[4]Criminal Law, 16 C. J. § 2325.

night, and the officers were in a section of the city through which a regular patrol had been established because of burglaries committed in that locality. They were driving south watching as they drove and when in the vicinity of South Park Lieutenant Mills noticed an unlighted automobile just off the street on the west side, in an, alley, close along the south side of an Oldsmobile service station and garage which was closed and unlighted.     Remarking to his brother officer, "There is a car there," he swung around in front of the alley and they alighted to investigate, turning their flash-light on the alley as they came up to it. Davidson was ahead and went to the front of the car, which was headed away from the street, while Mills stopped behind it, turning his flash-light on its rear. They found it to be a large Cadillac touring car with the two defendants sitting in the front seat.     Davidson asked them what they were doing there at that time of night, to which one of them replied that their car was "on the bum" and had broken down.     As Mills came up to the rear of the car and turned his flash-light upon it, he saw lying on its floor in the rear most of the burglar tools which defendants were convicted of having unlawfully in their possession. As soon as Mills saw them he recognized them as burglar tools and remarked, "You have got a fine bunch of tools here."     He ordered defendants to get out of the car and as they did so the officers placed them under arrest and handcuffed them together.     Mills then opened the door of the car and made some further investigation, finding in it, amongst other things, two loaded revolvers, one in a flap pocket by the driver's seat and one in the rear of the car.     Cartridges which fitted them were also found in the car and in defendant Medo's pocket.     Mills then took defendants to the police station in his Ford car, while Patrolman Davidson followed in defendants' Cadillac, which he had no

trouble in starting and driving. Defendants were booked on the blotter of the police station and locked up. Complaint followed, charging them with the offense of which they were convicted, and the regular proceedings were had to bring the case to trial.

Preliminary to a complaint being made against them, they were separately interviewed by the prosecuting attorney in the presence of a captain of the police force and a stenographer who took down what was said. They were first duly cautioned as to their rights and told that any statements that they made might be used in evidence against them. Each gave his explanation of how they came to be where they were found, denied any knowledge of the burglar tools being such or any guilty purpose or intent in that connection. It is sufficient to note that their stories failed to harmonize in various material particulars.

Upon the trial the burglar tools so seized were introduced in evidence, against the objection of defendants' counsel on the ground that they were secured by an unlawful search and seizure. Defendants' assignments of error center in the main to that proposition.

Lieutenant Mills, who was an officer of 19 years' experience, testified that an oil station across the street had been burglarized and the Standard Oil Works near by had been broken into and the combination knocked off the safe before that time; in his experience as an officer he had become familiar with the kind of tools adapted to and used in committing burglaries, and recognized those in defendants' car were such as soon as he saw them. He said that ordinarily a person driving along the street at that time of night would not notice this car at all, as it was up in an alley close against the building, but on their patrol they were watching out for anything unusual, were there "to look over anything in sight," and he caught

a glimpse of this unlighted car in an unusual place and condition as they drove along. Of the investigation which followed he said:

"We saw the car standing there with no lights and thought there was somebody trying to break in, so we jumped out of our car and went over to their car. * * * That is a public alley. It was a dark and rainy night. The first thing I did when I got to the car was to flash my light on the back end of the car. I was on the left-hand side of the car, the south side. Mr. Davidson went ahead and around on the other side of the car. I flashed my light on the back end of the car; that was a flashlight. I saw those tools lying there in the back end of the car on the floor. This sledge hammer, muffled hammer, and this jack and the monkey-wrench were in the back end of the car and these bolts were in the front end of the car. A big revolver was in the front end of the car. I knew what these tools were adapted for when I saw them. That muffled hammer is used so it won't make any noise in knocking the combination off a safe; this jack bolts down over the combination of the safe, like this."

He further explained in detail the nature and manner of using the different tools seized, as did another officer of 30 years' experience.

When the officers discovered this unlighted car in an alley close under the shadow of a garage building and filling station which was not lighted or in use, at that time of night, in a neighborhood where burglaries had previously been committed, they were justified in suspecting, and had good reason to believe, that any persons in that car at that time were not there for any lawful purpose, and it was their duty to investigate. They did so, and found these two men sitting in the front of the car armed and efficiently equipped for a burglary and quick get-away. When asked the occasion of their being there at that time under those conditions, they falsely claimed that their car had broken down. Neither officer had invaded their car,

or even touched it so far as shown, until Lieutenant Mills had seen and recognized as such the burglar tools it carried. By what he saw as he threw his flash-light on the car he recognized a criminal offense was being committed in his presence by those in possession of the car. No court has yet held it a violation of constitutional rights for a police officer on duty to look at or into an automobile in a public place without touching it and if he there discovers a criminal offense is being committed in his presence arrest the offender. Neither can there be any question of his right to search the car thereafter. The general rule upon that subject was recently stated by Mr. Justice Butler in *Agnello* v. *United States,* U. S. Adv. Ops. 1925-26, p. 1 (46 Sup. Ct. 4), as follows:

"The right without a search warrant contemporaneously to search persons lawfully arrested while committing crime and to search the place where the arrest is made in order to find and seize things connected with the crime as its fruits or as the means by which it was committed, as well as weapons and other things to effect an escape from custody is not to be doubted. See *Carroll* v. *United States,* 267 U. S. 132, 158 (45 Sup. Ct. 280, 39 A. L. R. 790); *Weeks* v. *United States,* 232 U. S. 383, 392 (34 Sup. Ct. 341, L. R. A. 1915B, 834, Ann. Cas. 1915C, 1177). * * * Such searches and seizures naturally and usually appertain to and attend such arrests."

That this rule applies to automobiles there can be no question. Not only has this court so held (*People* v. *Chyc,* 219 Mich. 273; *People* v. *Case,* 220 Mich. 379 [27 A. L. R. 686]; *People* v. *De Cesare,* 220 Mich. 417), but it was recently so decided by the Supreme Court of the United States (*Carroll* v. *United States,* 267 U. S. 132 [45 Sup. Ct. 280]) in an exhaustive opinion by Chief Justice Taft, wherein it is said in part:

"On reason and authority the true rule is that if the search and seizure without a warrant are made

upon probable cause, that is, upon a belief, reasonably arising out of circumstances known to the seizing officer, that an automobile or other vehicle contains that which by law is subject to seizure and destruction, the search and seizure are valid. * * *

"We have made a somewhat extended reference to these statutes (relative to search and seizure without a warrant for smuggling, carrying liquor into the Indian country, etc.) to show that the guaranty of freedom from unreasonable searches and seizures by the Fourth Amendment has been construed, practically since the beginning of the government, as recognizing a necessary difference between a search of a store, dwelling house, or other structure in respect of which a proper official warrant readily may be obtained and a search of a ship, motor boat, wagon, or automobile for contraband goods, where it is not practicable to secure a warrant, because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought."

In *Hester* v. *United States,* 265 U. S. 57 (44 Sup. Ct. 445), it appeared officers approaching defendant's home saw him take a jug out of an automobile and run, but drop it when they started after him and fired a shot in the air and they secured some of its contents. Objection was made to the introduction of liquor so seized on the ground it was unlawfully obtained by the invasion of private premises without a search warrant and Justice Holmes disposed of the objection as follows:

"As to that it is enough to say that, apart from the justification, the special protection accorded by the Fourth Amendment to the people in their 'persons, houses, papers and effects,' is not extended to the open fields. The distinction between the latter and the house is as old as the common law. 4 Bl. Comm. 223, 225, 226."

Strenuous complaint is made that the court left the question of whether the search and seizure was valid to the jury while it should have been disposed of by the court, as a question of law, citing cases to the

effect that an instruction which takes away from court or jury a matter strictly within its province amounts to an erroneous invasion. The charge as a whole is a clear, full and correct statement of the law as applied to the questions of fact involved, with all the safeguards it throws around the accused on trial as to presumption of innocence, burden of proof, reasonable doubt, etc., clearly stated, and makes clear that issues of fact are for the jury. Not, however, assuming to decide that all the essential elements of guilt which testimony of the prosecution tended to show had been proved beyond all reasonable doubt, the court made the following statement which defendants' counsel contends is palpably reversible error:

"I am going to leave to you the question of whether or not the police officers had a legal right at the time in question to arrest the defendants and search the automobile."

That question had been stressed, argued to the court in the presence of the jury, and testimony in relation to it ruled upon throughout the trial. The prosecution's testimony was not accepted by the defense as conclusive of the facts in many material particulars, but by cross-examination and argument such testimony and the inferences to be drawn from it were urgently controverted. The quoted introductory sentence of the court's charge on that subject, standing alone, would appear open to the infirmity complained of, but in the next sentence the court said: "The rule of law in reference to this question is as follows"—then proceeded to correctly and plainly instruct the jury at length on that subject, reading in part the language of a decision of this court. Having clearly and fully instructed the jury on the law, the court further said of that issue:

"The question is, here, under all the facts and circumstances, whether these officers, Mills and David-

son, had a legal right to search the automobile. In determining that question you will carefully follow the law the court has just read to you."

In the connection used, and with the explanatory instructions given, we find no reversible error in the language complained of.

Error is especially urged against admission of defendants' statements after their arrest because not made in the presence of each other. They were jointly informed against, and, not requesting separate trials, were tried together. The court instructed the jury that they must separately consider and pass upon each defendant's guilt or innocence; that they might "find each of the defendants or both of them either guilty or not guilty;" that in passing upon those statements they must discriminate between them, for the statements made by one could only be considered as bearing on his own guilt or innocence and could not be used against the other; "that is, you must apply the statement made by each one to the one who made it and not extend it to the other, because these statements were not taken in the presence of both men." With the jury so instructed, we find no error in permitting the prosecution to prove what statements defendants made when interviewed following their arrest, after being fully warned and advised of their rights in that respect.

The verdict of conviction and judgment thereon will stand affirmed.

BIRD, C. J., and SHARPE, SNOW, FELLOWS, CLARK, and McDONALD, JJ., concurred. WIEST, J., concurred in the result.